10-0878-cv
Federal Trade Commission v. Bronson Partners, LLC

# UNITED STATES COURT OF APPEALS

### FOR THE SECOND CIRCUIT

———————

August Term, 2010

(Argued: February 4, 2011        Decided: August 19, 2011)

Docket No. 10-0878-cv

———————

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee*,

–v.–

BRONSON PARTNERS, LLC, d/b/a NEW ENGLAND DIET CTR, d/b/a/ BRONSON DAY SPA; MARTIN HOWARD; and H&H MARKETING, LLC,

*Defendants-Appellants*,

SANDRA HOWARD,

*Defendant.*[*]

———————

Before:

CALABRESI, WESLEY, and LYNCH, *Circuit Judges*.

————————————

[*] The Clerk of Court is respectfully requested to amend the caption as set forth above.

Plaintiff-Appellee Federal Trade Commission alleged deceptive advertising claims against Defendants-Appellants Bronson Partners, LLC, Martin Howard, H&H Marketing, and Sandra Howard (collectively, "Bronson") based on two purported weight loss products.  The United States District Court for the District of Connecticut (Underhill, *J.*) granted summary judgment in favor of the FTC with regard to one product and Bronson conceded liability with respect to the other.  After a remedies hearing, the district court entered a permanent injunction against Bronson and awarded the FTC a money judgment for $1,942,325, an amount equal to Bronson's revenues from the two products, plus statutory interest.  On appeal, Bronson challenges both the power of the district court to award monetary relief and the means by which the district court calculated its award.  We hold that the district court had the power to award restitution pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b).  We further hold that the district court did not err in ordering Bronson to disgorge the full proceeds from its sale of the products in question.

AFFIRMED.

———————

LAWRENCE DEMILLE-WAGMAN, Federal Trade Commission, Washington, DC (Willard K. Tom, John F. Daly, *on the brief*) (Robin E. Eichen, Nur-ul-Haq, Federal Trade Commission, New York, NY, *of counsel*), *for Plaintiff-Appellee*.

STEVEN P. CALEY, Kelley Drye & Warren LLP, New York, NY (Lewis M. Rose, Daniel S. Blynn, Damon W. Suden, *on the brief*), *for Defendants-Appellants*.

---

GERARD E. LYNCH, *Circuit Judge*:

In 2003 and 2004, Bronson Partners, LLC, Martin Howard, H&H Marketing, and Sandra Howard (collectively, "Bronson") advertised and sold two purportedly miraculous weight loss products.  According to advertisements, Bronson's Chinese Diet Tea "SHEDS POUND AFTER POUND OF FAT – FAST!"  Among other claims, Bronson's advertisements also proclaimed that the Chinese Diet Tea "[e]liminates an amazing 91% of absorbed sugars," "[p]revents 83% of fat absorption," and "[d]oubles your metabolic rate to burn calories fast."  Over the same time period, Bronson advertised its Bio-Slim Patch as a way to achieve "LASTING weight loss."  The advertisements promised that by "carry[ing] on with your normal lifestyle" and wearing the Bio-Slim Patch, "[r]epulsive, excess ugly fatty tissue will disappear at a spectacular rate."

Bronson now admits that it engaged in deceptive advertising of both products in violation of the Federal Trade Commission Act, 15 U.S.C. §§ 41-58 ("FTC Act").  Bronson nevertheless appeals from a January 5, 2010 judgment of the United States District Court for the District of Connecticut (Underhill, *J.*) that entered a permanent injunction against Bronson and ordered it to pay $1,942,325 in monetary equitable relief plus statutory interest.  Bronson contests the judgment on the grounds that: (1) the statute

3

on which the district court's jurisdiction was based – Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) – does not permit a court to order monetary relief; and (2) even if monetary relief may be awarded, the district court calculated its award incorrectly by awarding legal rather than equitable relief.  We hold that Section 13(b) empowers a court to award ancillary equitable remedies, including disgorgement of wrongfully obtained funds, and that the district court's monetary award was appropriately calculated. Accordingly we AFFIRM the judgment of the district court.

## BACKGROUND

On November 4, 2004, the FTC sued Bronson for its deceptive advertising practices related to the thoroughly unmiraculous Chinese Diet Tea and Bio-Slim Patch. The FTC alleged that in 2003 and 2004, Bronson's advertisements for these two products violated Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.  Bronson conceded liability with respect to the Bio-Slim Patch and, on July 10, 2008, the district court granted summary judgment in favor of the FTC with respect to the Chinese Diet Tea.

On June 2, 2009, the district court held a remedies hearing.  The district court learned that after issuing refunds to some consumers, Bronson earned $1,942,325 in revenues from sales of the Chinese Diet Tea and the Bio-Slim Patch during 2003 and 2004.[1]  Together, sales of these two products accounted for 25.25 percent of Bronson's company-wide revenues during 2003 and 2004.  Bronson deposited the proceeds from all

---

[1] The parties agreed below that the revenues have been calculated correctly.

of its more than sixty products, including the Chinese Diet Tea and the Bio-Slim Patch, into one bank account.  Bronson did not maintain separate records to identify which proceeds were tied to particular products.  Likewise, Bronson did not calculate its expenses or losses on a per-product basis; as a result, Bronson submitted to the district court its overall expenses and losses for all of its sixty-plus products, but could not provide an itemized list of expenses and losses attributable to the Chinese Diet Tea and the Bio-Slim Patch.

On December 4, 2009, the district court issued its remedies order.  FTC v. Bronson Partners, LLC, 674 F. Supp. 2d 373 (D. Conn. 2009).  The district court first determined that it could award monetary relief pursuant to Section 13(b) of the FTC Act.  Section 13(b) does not explicitly permit monetary awards; the provision states that "in proper cases the [FTC] may seek, and after proper proof, the court may issue, a permanent injunction."  15 U.S.C. § 53(b).  The court nevertheless found monetary relief available as a form of ancillary equitable relief that could be granted under its equitable jurisdiction.

Next, the district court calculated its award using our Court's two-step burden-shifting framework for calculating equitable monetary relief.  That framework requires a court to look first to the FTC to "show that its calculations reasonably approximated the amount of the defendant[s'] unjust gains" and then shift the burden "to the defendants to show that those figures were inaccurate."  FTC v. Verity Int'l, Ltd., 443 F.3d 48, 67 (2d Cir. 2006) (internal quotation marks and citation omitted).

5

At the first step of the burden-shifting analysis, the FTC calculated Bronson's unjust gains as $1,942,325.  This amount, the FTC asserted, equals both Bronson's revenues from the Chinese Diet Tea and the Bio-Slim Patch and consumers' losses on these same products.  The district court agreed, reasoning that Bronson collected money directly from consumers without using a middleman.  Further, there was no evidence that any of Bronson's gains were "just" gains because the Chinese Diet Tea and the Bio-Slim Patch in no instance worked as advertised.  Additionally, the district court rejected Bronson's assertion that the baseline should be reduced to account for bounced checks or credit card chargebacks.  Bronson argued that the court should estimate that 25.25 percent of all of Bronson's company-wide losses due to bounced checks and credit card chargebacks were attributable to the Chinese Diet Tea and the Bio-Slim Patch because these products accounted for 25.25 percent of Bronson's revenues.  The district court rejected Bronson's rough calculations:

> It is entirely possible that the amount of chargebacks and bounced check fees attributable to Diet Tea or the Patch exceed 25.25% of total chargebacks and bounced checks.  It is also entirely possible that defendants issued few, if any, chargeback refunds and received few bounced checks for Diet Tea and the Patch. When defendants' lack of record keeping renders it impossible to distinguish between just and unjust gains, the risk of the uncertainty falls on the wrongdoer.

Bronson, 674 F. Supp. 2d at 381-82.

At the second step of the burden-shifting analysis, Bronson urged the district court to reduce the FTC's calculation to account for Bronson's expenses, including postage,

6

storage, and advertising.  These operating expenses totaled $1,986,119, including

$1,217,862 in expenditures to advertise the diet tea.  Beyond these expenses, Bronson

could not present accurate figures specific to the Chinese Diet Tea or the Bio-Slim Patch

for the remainder of its costs, due in part to incomplete record keeping.  Relying on our

decision in <u>Verity</u>, the district court rejected Bronson's effort to deduct its expenses.  The

district court reasoned that in this case, because no middleman had been involved, "the

full amount of . . . proceeds, even if they are equivalent to the consumers' losses, may be

the subject of an award of equitable relief."  <u>Id</u>. at 384.

On December 29, 2009, the district court entered a permanent injunction

prohibiting Bronson from, among other things, "making, expressly or by implication, any

material false or misleading oral or written statement or representation in connection with

the advertising, marketing, promotion, offer for sale, distribution, or sale of any weight

loss product."  On January 5, 2010, the district court entered a judgment against Bronson

in the amount of $1,942,325 plus statutory interest.

This appeal followed.

## DISCUSSION

Bronson challenges both the district court's authority to award a money judgment

under Section 13(b) of the FTC Act and the district court's computation of that award in

this case.  Because we conclude that Section 13(b) permits a court to order ancillary

equitable relief, including monetary relief, and that such relief may be calculated on the

basis of proceeds that the defendant received from its unlawful activity, we affirm the judgment of the district court.

I.  Standard of Review

The scope of the district court's remedial authority under Section 13(b) is an issue of statutory interpretation that we decide de novo.  See United States v. Douglas, 626 F.3d 161, 164 (2d Cir. 2010).

II.  Ancillary Remedies Under Section 13(b) of the FTC Act

Section 13(b) of the FTC Act provides: "in proper cases the [FTC] may seek, and after proper proof, the court may issue, a permanent injunction."  15 U.S.C. § 53(b). While the provision's express text refers only to injunctive relief, courts have consistently held that "the unqualified grant of statutory authority to issue an injunction under [S]ection 13(b) carries with it the full range of equitable remedies, including the power to grant consumer redress and compel disgorgement of profits."  FTC v. Gem Merch. Corp., 87 F.3d 466, 468 (11th Cir. 1996); see also FTC v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1202 n.6 (10th Cir. 2005); FTC v. Pantron I Corp., 33 F.3d 1088, 1102 (9th Cir. 1994); FTC v. Sec. Rare Coin & Bullion Corp., 931 F.2d 1312, 1314-15 (8th Cir. 1991); FTC v. Amy Travel Serv., Inc., 875 F.2d 564, 571-72 (7th Cir. 1989); FTC v. Sw. Sunsites, Inc., 665 F.2d 711, 718 (5th Cir. 1982).  We join these courts and hold that Section 13(b) of the FTC Act permits courts to grant ancillary equitable relief, including

8

equitable monetary relief.  Accord Verity, 443 F.3d at 66 (assuming without deciding the same).

In Porter v. Warner Holding Co., 328 U.S. 395 (1946), the Supreme Court held that the Emergency Price Control Act of 1942 – which permitted a federal administrator to seek a "permanent or temporary injunction, restraining order, or other order" – authorized the administrator to obtain not just injunctive relief but also a money judgment.  The Court provided two independent reasons for its conclusion.  First, the Court explained:

> [An order for disgorgement] may be considered an equitable adjunct to an injunction decree. Nothing is more clearly a part of the subject matter of a suit for an injunction than the recovery of that which has been illegally acquired and which has given rise to the necessity for injunctive relief. . . . [W]here, as here, the equitable jurisdiction of the court has properly been invoked for injunctive purposes, the court has the power to decide all relevant matters in dispute and to award complete relief even though the decree includes that which might be conferred by a court of law.

Id. at 399 (internal citations and footnote omitted).[2]  Second, relying on the text of the Emergency Price Control Act, the Court reasoned that a money judgment could be an "other order" that is "appropriate and necessary to enforce compliance with the act."  Id. at 400.

---

[2] Monetary damages were not traditionally available in equity because "[m]oney damages are, of course, the classic form of *legal* relief."  Mertens v. Hewitt Assocs., 508 U.S. 248, 255 (1993).  The power of equitable courts to afford "complete relief," Porter, 328 U.S. at 399, meant, however, that equitable courts could afford monetary relief when necessary to provide a complete equitable remedy.  See infra Part III.A.

The Court subsequently made clear that the two bases for its holding in <u>Porter</u> were indeed independent.  In <u>Mitchell v. Robert DeMario Jewelry, Inc.</u>, 361 U.S. 288 (1960), the Court concluded that a provision of the Fair Labor Standards Act that authorized the district court to "restrain violations of [the statute]" carried with it the power to award backpay to employees who had been wrongfully discharged.  After citing <u>Porter</u>'s holding that a district court empowered to enjoin statutory violations may award such ancillary remedies as necessary to afford complete relief, the Court went on to note:

> The applicability of this principle is not to be denied, either because the Court there considered a wartime statute, or because, having set forth the governing inquiry, it went on to find in the language of the statute affirmative confirmation of the power to order reimbursement.

<u>Mitchell</u>, 361 U.S. at 291; <u>accord</u> <u>SEC v. Texas Gulf Sulphur Co.</u>, 446 F.2d 1301, 1307-08 (2d Cir. 1971) (finding in the securities law context that equitable "ancillary relief" may be awarded, despite the fact that the statute referenced only a "permanent or temporary injunction").

Like the provision at issue in <u>Mitchell</u>, Section 13(b) contains no reference to "other orders."  Nonetheless, the principle that "the comprehensiveness of [the district court's] equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command," <u>Mitchell</u>, 361 U.S. at 291, quoting <u>Porter</u>, 328 U.S. at 398, applies with equal force to actions under Section 13(b).  By empowering courts to issue injunctive relief, Section 13(b) invokes the equitable jurisdiction of the court.  A money

10

judgment is thus permitted as a form of ancillary relief because, once its equitable jurisdiction has been invoked, "the court has the power to decide all relevant matters in dispute and to award complete relief." Porter, 328 U.S. at 399.

Bronson disputes this conclusion by pointing out that unlike Section 13(b), Section 19 of the FTC Act, 15 U.S.C. § 57b(b), expressly provides for monetary damages.[3] Bronson contends that the broad language of Section 19 limits Section 13(b) to its terms. We are unpersuaded. Section 19 does not purport to limit Section 13(b). Quite the contrary, Section 19 states that "[n]othing in this section shall be construed to affect any authority of the Commission under any other provision of law." 15 U.S.C. § 57b(e). Moreover, Bronson's suggested reading of Section 19 would impose an untenable restriction on Section 13(b) given that "[n]othing is more clearly a part of the subject matter of a suit for an injunction than the recovery of that which has been illegally acquired and which has given rise to the necessity for injunctive relief." Porter, 328 U.S. at 399.

---

[3] Section 19 authorizes the district court to hear suits to enforce the Commission's cease-and-desist orders and, where appropriate, to award "such relief as the court finds necessary to redress injury to consumers," which may include "the refund of money or return of property." 15 U.S.C. § 57b(a)(2) & (b). Because, under Section 19, the Commission may bring suit only where the defendant has been the subject of a prior order entered in the wake of a lengthy administrative process, that provision has the disadvantages of creating substantial opportunities for delay as well as allowing merchants who knowingly engage in fraud at least once free shot at violating the Act. In contrast, Section 13 requires only that the Commission establish that the defendant's conduct on a particular occasion violated the general prohibitions of the statute.

11

In sum, Section 13(b) of the FTC Act permits courts to award not only injunctive relief but also ancillary relief, including monetary relief.

III.  Monetary Relief Under Section 13(b)

Bronson next argues that, to the extent Section 13(b) permits the district court to award monetary relief at all, it permits only "equitable monetary relief," that is, relief of a type that historically only a court of equity could provide.  Bronson maintains that because the district court's award cannot be described as "either equitable restitution or disgorgement of profits," it constitutes legal rather than equitable relief and therefore exceeds the remedial ambit of Section 13(b).  We agree that under our precedents a district court proceeding under Section 13(b) may award only remedies that were uniquely available in equity courts at the time of the divided bench.  We disagree, however, with Bronson's assertion that, because the district court's award did not constitute either "equitable restitution" or "disgorgement of profits," it ran afoul of this requirement.

A.  Monetary Relief, Equitable and Legal

Our conclusion in Part II that Section 13(b) does not limit the district court to awarding only injunctions rested on the well-established principle that a court sitting in equity is empowered "to award complete relief" including relief that customarily "might be conferred by a court of law."  Porter, 328 U.S. at 399.  At the time of the divided bench, a party seeking a mixture of legal and equitable relief on a single claim – damages

12

and an injunction, for example – could not obtain full redress in the courts of law, which were prohibited from awarding equitable relief of any kind.  In contrast, pursuant to the "equitable cleanup doctrine," a court of equity could fully resolve the matter – awarding the injunction, over which it had exclusive jurisdiction, as well as the damages as an equitable adjunct to the primary decree.  See 1 John Norton Pomeroy, A Treatise on Equity Jurisprudence As Administered in the United States of America §§ 181, 231 (5th ed. 1941); Medtronic, Inc. v. Intermedics, Inc., 725 F.2d 440, 442 (7th Cir. 1984) (Posner, J.); see also Mertens v. Hewitt Assocs., 508 U.S. 248, 256 (1993) ("At common law [] there were many situations . . . in which an equity court could 'establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority.'") (quoting Pomeroy, supra).  If we were writing on a clean slate we would therefore have no cause to consider whether the district court's monetary award would traditionally have been characterized as equitable or legal.  Relying on the cleanup doctrine, Porter and its progeny instruct that when a court is statutorily authorized to enjoin unlawful conduct, it may invoke the full range of its remedial powers – both legal and equitable – in fashioning an order that affords "complete relief."

Our court, however, has taken a somewhat narrower view of the ancillary remedies available to the district court when proceeding under Section 13(b).  In FTC v. Verity International, Ltd., 443 F.3d 48 (2d Cir. 2006), we reviewed an order of the district court that imposed monetary penalties on several defendants who had violated the FTC Act by

adding fraudulent charges to consumers' telephone bills.  During the initial period of the scheme, one telephone service provider, AT&T, deducted its own costs from the funds charged to consumers before paying the balance to the defendants.  Later, pursuant to an agreement with a different phone company, Sprint, the defendants received the entire proceeds of the fraud in the first instance and then cut a check to Sprint for its services. After a bench trial finding that the defendants had violated the FTC Act, the district court awarded a judgment for the Commission in the amount of $17.9 million, a figure intended to account for "the full amount lost by consumers" due to the scheme.  Verity, 443 F.3d at 67.

We vacated the judgment, holding that Section 13(b) did not authorize the district court to base its award reflexively on the loss to consumers that resulted from the defendants' fraud.  Our decision was motivated by the belief that because the authority to grant ancillary remedies under Section 13(b) "derives from the district court's equitable jurisdiction," the court in such a case may grant only remedies that were uniquely equitable at the time of the divided bench.  Id.  Though, as we have already noted, this premise is historically questionable, it nevertheless led us to establish that the district court is prohibited in a Section 13(b) action from awarding legal remedies such as damages or legal restitution.  Although we acknowledged the existence of uniquely equitable monetary remedies, we emphasized that those remedies are restitutionary, meaning that they, unlike the district court's order, are "measured by a defendant's unjust

14

gain, rather than by a plaintiff's loss."  Id., quoting Pereira v. Farace, 413 F.3d 330, 340
(2d Cir. 2005) (internal quotation marks omitted).  Accordingly, we concluded that the
district court erred in basing its monetary award on the victims' loss, without discounting
for the phone-service fees that were collected during the AT&T period but never made
their way into the defendants' hands.

    B.  Calculating Equitable Monetary Relief

    To guide the district court on remand, our opinion in Verity adopted a two-step
burden-shifting framework for calculating monetary relief under Section 13(b).  443 F.3d
at 67.  "This framework requires the FTC to first show that its calculations reasonably
approximated the amount of the defendant's unjust gains, after which the burden shifts to
the defendants to show that those figures were inaccurate."  Id. (internal quotation marks
omitted), citing FTC v. Febre, 128 F.3d 530, 535 (7th Cir. 1997).  After the burden shifts,
the risk of uncertainty "fall[s] on the wrongdoer whose illegal conduct created the
uncertainty."  443 F.3d at 69.

    Bronson argues that the district court erred at the first step of the calculation by
failing to account for bounced checks and credit card chargebacks related to the sale of
the diet tea and patch.  As our decision in Verity made clear, funds returned to consumers
or never received by a defendant are not unjust gains.  Id.  Which party must show that
particular revenues were or were not received by the defendant will vary, however,

depending on the nature of the funds in question.  In this case, the evidentiary burden was on Bronson to establish that these particular funds never made their way into its coffers.

The district court arrived at its baseline calculation of Bronson's unjust gains using sales figures and pricing information that neither party disputed.  During the relevant period, Bronson sold 57,177 units of diet tea and 2,328 units of the Bio-Slim Patch that generated total revenues of $2,071,257.  Because the tea and Bio-Slim Patch provided none of their advertised benefit to consumers, none of Bronson's gains from the sale of these products could be considered "just."  As we established in Verity, in calculating the remedial baseline, the district court is also obliged to take account of systematic divergences between the victims' losses and the defendant's gains from wrongdoing.  But there was no reason, analogous to the presence of the middleman in Verity, for the district court to believe that such systematic divergences existed in this case.  The $2,071,257 total therefore represents a reasonable approximation of the gains that Bronson could be expected to have realized from the sale of the two products and, under normal circumstances, would constitute the remedial baseline.

While the district court must take account of systematic divergences between the defendant's gain and the losses of the victims in calculating the remedial baseline, claims that *individual* transactions were atypical and resulted in a lower-than-expected gain to the wrongdoer are properly considered at stage two of the analysis, where the burden of proof rests with the defendant.  In this case, because the FTC did not dispute that Bronson

16

issued $128,932 in refunds related to the products in question, the district court discounted the presumptive amount of Bronson's unjust gains to $1,942,325 without putting the defendants to their proof.

The burden remained with Bronson, however, to show that it was entitled to a further reduction of the award on account of bounced checks and credit card chargebacks. This it has failed to do. Bronson's incomplete records only allow it to calculate losses from bounced checks and credit card chargebacks across all of its sixty-plus products. Bronson therefore suggests that the court should have estimated that 25.25 percent of these losses were attributable to the Chinese Diet Tea and the Bio-Slim Patch because these products accounted for 25.25 percent of Bronson's revenues. Like the district court, we decline to indulge this presumption in light of the complete lack of evidence connecting bounced checks and credit card chargebacks to the two products at issue.

C. Identifying the Remedy

Bronson's remaining argument is that the district court's monetary award was an impermissible legal, rather than equitable, award, because the court failed to identify particular funds in the defendants' hands that were specifically traceable to the fraudulently marketed products. In essence, Bronson argues that the district court was required to conform its award to the ancient remedy of constructive trust, or otherwise to limit its judgment to the profits generated by the fraudulently marketed products. In our view, the range of equitable monetary remedies available to the district court in Section

17

13(b) actions is not so limited.  Because we conclude that the district court's award satisfies the requirements of equitable disgorgement, we affirm.

    1.  <u>Unpacking the Law of Restitution</u>

Bronson's tracing argument turns on the fact that the district court described its monetary award as "equitable restitution."  Because the term "restitution" entered the legal lexicon relatively recently, its use is often a source of confusion among courts and commentators.  In 1936, the American Law Institute adopted the Restatement of Restitution in an effort "to demonstrate that a range of seemingly disparate rights and remedies," including equitable claims such as constructive trust and legal ones such as quasi-contract, "could in fact be explained . . . in terms of the common objective of preventing unjust enrichment."  Andrew Kull, <u>Rationalizing Restitution</u>, 83 Calif. L. Rev. 1191, 1192 (1995); <u>see</u> Restatement of Restitution (1937).[4]  Prior to the publication of the Restatement, "the common law, organized for centuries in terms of remedies rather than theories of liability, rarely acknowledged the avoidance of unjust enrichment as one of its actuating principles."  Kull, <u>supra</u>, at 1192.  Continuing the reorientation of Anglo-American law that began with the nineteenth century treatise writers, the reporters of the Restatement thus conceived of "restitution" as a unifying theory of private-law liability

---

[4] The reporters acknowledged at the time that the term "restitution" was "indefinite in connotation and unfamiliar to the profession."  Warren A. Seavey & Austin W. Scott, <u>Restitution</u>, 54 L.Q. Rev. 29, 29 (1938).  This choice of an unfamiliar title was consciously made, as it allowed the Institute to confer a novel, technical meaning on a term that carried the popular connotation of "the right to recover back something which one once had" but had no previous legal salience.  <u>Id</u>.

18

akin to tort or contract – a descriptor of a class of wrongs rather than of any particular remedy.[5]

Nonetheless, in view of the fact that certain remedies, such as the constructive trust, are awarded almost exclusively in cases that sound in unjust enrichment, courts and commentators often use the term "restitution" as a metonym for the class of remedies particularly identified with that head of liability. Moreover, because the feature that distinguishes restitution from tort and contract is that liability turns on the unjust enrichment of the defendant, conceptual bleeding has led courts to apply the label "restitution" to remedies that measure recovery by the defendant's gain, even where the basis of liability is a statutory violation rather than common law principles. See, e.g., Curtis v. Loether, 415 U.S. 189, 197 (1974) (Title VII); Porter, 328 U.S. at 400 (Emergency Price Control Act); AMW Materials Testing, Inc. v. Town of Babylon, 584 F.3d 436, 442-43 (2d Cir. 2009) (CERCLA); Verity, 443 F.3d at 66-67 (FTC Act); SEC v. Tex. Gulf Sulphur Co., 446 F.2d 1301, 1307 (Securities Exchange Act of 1934).

Grouping legal rules that focus on the benefit to the wrongdoer under a single conceptual heading is a sensible and unproblematic practice in most cases. The Supreme Court has cautioned, however, that when the district court's jurisdiction is founded on a statutory scheme that makes the historical divide between law and equity salient, it is

---

[5] Of course, the term "restitution" is also used to describe a particular, statutorily-authorized penalty that may flow from criminal conviction. See 18 U.S.C. § 3663A. Although conceptually related, that sense of restitution is not implicated in this purely civil case.

19

necessary to unbraid the law of restitution – to separate legal claims from equitable ones and rights from remedies.  In Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204 (2002), the Court considered whether a claim for monetary "restitution" pursuant to a subrogation provision in an employee health plan was barred by language in the Employee Retirement Income Security Act of 1974 (ERISA) that limits the district court's jurisdiction to actions seeking either to enjoin violations of a covered plan or to obtain "other appropriate equitable relief."  See 29 U.S.C. § 1132(a)(3)(B).  Justice Scalia's majority opinion emphasized that in order to determine whether the plaintiffs' claims were properly characterized as legal or equitable, it was necessary to consider "the basis for [the] claim[s] and the nature of the underlying remedies sought."  534 U.S. at 213 (internal quotation marks omitted).

Focusing on the first prong of the inquiry, the Court recognized that the "rubric of restitution" embraces several historically distinct private-law claims, some of which evolved at law and others of which evolved in equity.  Id. at 212.  Broadly speaking, a claim sounding in legal restitution seeks to impose personal, monetary liability on the defendant.  Id. at 213.  In contrast, "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."  Id. at 214.  Ultimately, the Knudson Court found it dispositive that "the basis for petitioners' claim is not that respondents hold particular funds that, in good conscience, belong to petitioners, but that

20

petitioners are contractually entitled to *some* funds for benefits that they conferred." <u>Id</u>. Such a claim, the Court concluded, was purely legal and therefore not authorized under ERISA.

Although it was issued in a different context and under a different statutory mandate, <u>Knudson</u>'s admonition to examine carefully "the basis for [restitution] claims and the nature of the underlying remedies sought" is equally applicable to actions seeking "restitution" under Section 13(b) of the FTC Act. Unlike the claims of the petitioners in <u>Knudson</u>, however, the basis for the monetary claim in Section 13(b) cases is seldom problematic. That is because, in the majority of such cases, as here, the defendants are alleged to have violated specific provisions of the FTC Act itself.[6] Because the basis of liability is statutory, the Commission has no need to rely on common law theories of unjust enrichment, be they equitable or legal.

It is because Bronson fails to recognize this distinction between <u>Knudson</u> and the present case that its tracing argument fails. <u>Knudson</u> teaches that a court confronted with a private, equitable claim sounding in unjust enrichment may ordinarily award only a constructive trust or an equitable lien, because only those remedies require the district court to find that the defendant holds specific property that is traceable to the proceeds of his wrongdoing. <u>See</u> 534 U.S. at 213-14. But where the basis of the claim is a violation

_____

[6] In this case, Bronson's marketing of the diet tea and patch violated 15 U.S.C. § 52, which makes it "unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement," provided certain additional conditions are met.

21

of the FTC Act, the district court needs to determine only that "the nature of the underlying remedies sought" was historically equitable.  Id.

In FTC v. Verity, that inquiry led us to conclude that a monetary award that we characterized as "equitable restitution" was authorized by Section 13(b) and not subject to jury trial, notwithstanding the district court's apparent failure to follow the arcane tracing rules that Bronson would have us apply here.  443 F.3d at 67.  In order to make clear that the district court was acting within its authority, our opinion in Verity should have identified the specific historical remedy that underlay the award of "equitable restitution" in that case.  Given that omission on our part, it is understandable that the district court in the present case likewise failed to do so.  Any error in that regard was harmless, however, because, as outlined below, we conclude that the substance of the district court's monetary judgment comports with the equitable remedy of disgorgement.  Cf. Walley v. Dep't of Veterans Affairs, 279 F.3d 1010, 1021-22 (Fed. Cir. 2002) (concluding that an error in terminology can be harmless so long as the substantive legal standard applied was the correct one), abrogated on other grounds by Garcia v. Dep't of Homeland Sec., 437 F.3d 1322 (Fed. Cir. 2006).

### 2.  Defining Equitable Disgorgement

Although we have not previously applied the label "disgorgement" to an award of equitable monetary relief under Section 13(b), "'disgorgement' is a well-established remedy in the Second Circuit."  SEC v. Cavanagh, 445 F.3d 105, 116 (2d Cir. 2006).  We

most commonly encounter demands for disgorgement in the context of enforcement

actions under Section 21(e) of the Securities Exchange Act of 1934.  Persuaded by

arguments similar to those that compel our holding in Part II today, we concluded some

time ago that Section 21(e), which authorizes an action to enjoin violations of the

securities laws, also permits the district court to award disgorgement as an equitable

adjunct to its injunctive decree.  See Tex. Gulf Sulphur Co., 446 F.2d at 1307-08.[7]  Like

other equitable remedies such as the constructive trust and the equitable lien,

disgorgement is "a method of forcing a defendant to give up the amount by which he was

unjustly enriched."  SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 102 (2d Cir.

1978).  Yet disgorgement – at  least when sought by public agencies such as the SEC and

the FTC – has several features that make it distinct from the remedies available to private

litigants seeking to press common law claims.

First, disgorgement is a distinctly public-regarding remedy, available only to

government entities seeking to enforce explicit statutory provisions.  We noted this

particular feature of disgorgement in SEC v. Cavanagh, a case that required us to consider

---

[7] The relevant provision of Section 21(e) states:

> Whenever it shall appear to the Commission that any person
> is engaged or is about to engage in acts or practices
> constituting a violation of [the securities laws], it may in its
> discretion bring an action . . . to enjoin such acts or practices,
> and upon a proper showing a permanent or temporary
> injunction or restraining order shall be granted without bond.

15 U.S.C. § 78u(d)(1).

whether the Judiciary Act of 1789 barred the district court from awarding disgorgement in an SEC enforcement action.  Although we analogized disgorgement to the "ancient remedies of accounting, constructive trust, and restitution" to conclude that the district court's order did not run afoul of the Act, 445 F.3d at 119, we also recognized that disgorgement is distinguishable from those "analogous forms of relief" in the crucial respect that, where disgorgement is sought, it is the government, not the victim of the wrongdoing, who seeks to recover the defendant's unlawful gains, id. at 118 & n.29.

The other distinctions largely flow from the first.  It is well established that "courts of equity will go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 326 (1999) (internal quotation marks omitted).  In light of this fact, and because "the primary purpose of disgorgement orders is to deter violations of the [ ] laws by depriving violators of their ill-gotten gains," SEC v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir. 1997), a regulatory agency seeking disgorgement need not identify specific victims to whom payment is due "in good conscience," as it would be required to do if seeking to impose a constructive trust.  See Knudson, 534 U.S. at 213.  Indeed, in some securities enforcement cases, the nature of the harm is so diffuse that the specific identities of the victims would be nearly impossible to ascertain and the quantum of their individual entitlements too minimal to compute.

24

Nor, having obtained a disgorgement award, are public entities required to make any particular effort to compensate the victims that they *can* identify. See Fischbach, 133 F.3d at 176; see also SEC v. Wang, 944 F.2d 80, 88 (2d Cir. 1991) (affirming a distribution plan that engaged in "line-drawing[,] which inevitably leaves out some potential claimants").  While agencies may, as a matter of grace, attempt to return as much of the disgorgement proceeds as possible, the remedy is not, strictly speaking, restitutionary at all, in that the award runs in favor of the Treasury, not of the victims.

Finally, and most importantly for this case, unlike an equitable lien or a constructive trust, disgorgement does not require the district court to apply equitable tracing rules to identify specific funds in the defendant's possession that are subject to return.[8]  Tracing is necessary where a private plaintiff seeks to impose a constructive trust, because liability is premised on the fiction that the victim at all times retained title to the property in question, which the defendant merely holds in trust for him. Consequently, a plaintiff who has obtained a constructive trust is generally entitled to priority over other creditors in satisfying his judgment from the proceeds of the traceable funds or property.  But when a public entity seeks disgorgement it does not claim any

---

[8] The rules of tracing "enable victims to identify particular dollars or assets as the ones they lost."  Douglas Laycock, Modern American Remedies 673-74 (3d ed. 2002). Generally, "[a]ll rules for tracing cash through bank accounts start with the fiction that the victim's dollars are 'in' the account."  Id. at 674.  Funds can be traced into commingled accounts and courts apply an irrebuttable presumption that a wrongdoer spends his own money first.  Id.  As a result, "as long as the amount in the account exceeds the amount of misappropriated funds that were deposited there, all the plaintiffs' money is still in the account."  Id.

entitlement to particular property; it seeks only to "deter violations of the [ ] laws by depriving violators of their ill-gotten gains." <u>Fischbach</u>, 133 F.3d at 175. Nor is an agency that has won a disgorgement order entitled to priority over the other creditors of the defendant. In this case, the FTC asks only to have a judgment for the amount of Bronson's ill-gotten gains, which, if Bronson is insolvent, will simply permit the Commission to share with other creditors on an equal basis.

In light of this distinction, it is unsurprising that Bronson can point to no case in which a public agency seeking to obtain equitable monetary relief has been required to satisfy the tracing rules.[9] To the contrary, the Federal Reporter is replete with instances in which judges of this Court deeply familiar with equity practice have permitted the SEC to obtain disgorgement without any mention of tracing. <u>See</u>, <u>e.g.</u>, <u>Commonwealth Chem.</u>, 574 F.2d at 95-96 (Friendly, J.). Indeed, it is by now so uncontroversial that tracing is not required in disgorgement cases that we recently rejected an argument to the contrary via summary order. <u>SEC v. Rosenthal</u>, Nos. 10-1204-cv, 10-1253-cv, 2011 WL 2271743, at *1 (2d Cir. June 9, 2011) (Summary Order); <u>see also</u> <u>SEC v. Banner Fund Int'l</u>, 211 F.3d

---

[9] <u>FTC v. Direct Marketing Concepts, Inc.</u>, 648 F. Supp. 2d 202 (D. Mass. 2009), <u>aff'd</u>, 624 F.3d 1 (1st Cir. 2010), is not such a case. Despite Bronson's reliance on it, that case does not hold that the FTC is limited to recovering traceable funds or profits when proceeding via Section 13(b). To the contrary, the district court recognized the very distinction between the constructive trust and equitable disgorgement that we draw today and went on to award disgorgement measured by the defendant's revenues from the fraud. To the extent <u>Direct Marketing</u> suggests that in the normal course the FTC's disgorgement recovery will be capped at the defendant's profits, we reject that conclusion as inconsistent with the precedents of our circuit. <u>See</u> <u>infra</u>.

26

602, 617 (D.C. Cir. 2000) (reasoning that "disgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset").

It is true that in <u>Verity</u>, our only prior decision dealing with remedies under Section 13(b), we suggested that, under certain circumstances, tracing principles might be relevant in assessing the FTC's ability to obtain monetary relief under that provision.  <u>See</u> 443 F.3d 48, 67 n.10.  We do not, however, read <u>Verity</u> to require tracing when the FTC seeks only a disgorgement judgment that provides it no priority over the defendant's other general creditors.  To the contrary, in <u>Verity</u> we permitted full restitution of amounts that were paid to the defendant directly by the consumers, without any suggestion that the district court did, or was required to, conduct a tracing analysis to assure itself that the balances in the defendants' account at the time of the court order could still be traced back to the payments of the consumers.  The only limitation that <u>Verity</u> placed on the district court's remedial authority was the requirement that any monetary award be limited to funds that actually were paid to the defendants, as opposed to money that was paid by the consumer but withheld by a middleman. That condition was necessary to ensure that the award could properly be considered a disgorgement of money received by the defendants, and could be characterized as equitable (and therefore authorized by Section 13(b) and permissible without a jury trial consistent with the Seventh Amendment), as opposed to compensation to the victims in the amount of their loss

27

(which would be characterized as damages and therefore as legal, rather than equitable, restitution). Tracing, in the sense required for such remedies as constructive trust, was not required.

Despite acknowledging that disgorgement does not require tracing, Bronson maintains that "the calculation of net profits is the generally accepted measure for the equitable remedy of disgorgement damages." We need not dwell long on this argument, as it is well established that defendants in a disgorgement action are "not entitled to deduct costs associated with committing their illegal acts." SEC v. Cavanagh, No. 98-Civ.-1818-DLC, 2004 WL 1594818, at *30 (S.D.N.Y. July 16, 2004), aff'd, 445 F.3d 105 (2d Cir. 2006). Although we sometimes refer casually to the power of district courts to "require wrongdoers to disgorge fraudulently obtained *profits*," Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 74, 81 (2d Cir. 2006) (emphasis added), that is because in many securities fraud cases the wrongdoer receives no direct monetary transfer from his victims. Where that is true, the defendant's ill-gotten gains are equal to the profits of his unlawful trading. But where the profits from fraud and the defendant's ill-gotten gains diverge, the district court may award the larger sum. In SEC v. DiBella, for example, we rejected an argument that "disgorgement is limited to profits reaped through [the defendant's] securities law violations," such that a defendant who was paid to assist another's violation of Section 10(b) could not be required to disgorge his fees. 587 F.3d 553, 572 (2d Cir. 2009) (internal quotation marks omitted).

28

And in <u>Verity</u>, we explained that although the defendants-appellants were not liable for consumer payments that never reached them, "the district court should determine the amount of the . . . total billings that the defendants-appellants received . . ., without deducting monies paid by the defendants-appellants to other parties."[10]  443 F.3d at 68. Likewise, at least three other circuits measure unjust gains in FTC actions by revenues instead of profits. <u>See</u> <u>FTC v. Direct Mktg. Concepts, Inc.</u>, 624 F.3d 1, 14-16 (1st Cir. 2010); <u>FTC v. Kuykendall</u>, 371 F.3d 745, 765-67 (10th Cir. 2004) (holding that unjust gains should be calculated based on a defendant's "gross receipts"); <u>Febre</u>, 128 F.3d at 536.[11]

In sum, Bronson is not entitled to deduct its expenses from the restitutionary baseline.  The district court properly assessed Bronson's unjust gains as $1,942,325, the amount Bronson received in revenues from sales of the Chinese Diet Tea and the Bio-Slim Patch after check refunds.

---

[10] Bronson argues that this holding in <u>Verity</u> conflicts with <u>Sheldon v. Metro-Goldwyn Pictures Corp.</u>, 106 F.2d 45 (2d Cir. 1939).  We disagree.  In <u>Sheldon</u>, the defendants contracted to share a set percentage of their profits with a third party.  Our Court found that the defendants' unjust gains did not include the profits they were contractually obligated to pass on to the third party.  <u>Id</u>. at 51 ("The payments were never profits of the defendants at all; the contracts effectively laid hold of them the moment they came into existence.").  Such an unusual profit-sharing arrangement was not present in <u>Verity</u> and likewise is not at issue here.

[11] The calculation of "profit" suggested by Bronson is particularly inappropriate. Bronson seeks to deduct from its revenue not the (negligible) costs of the products that it fraudulently sold, but the (substantial) costs of placing its fraudulent advertisements.  This argument, equivalent to an armed robber's seeking to deduct the cost of his gun from an award of restitution, could stand with the classic patricide who claims mercy as an orphan as an illustration of the concept of chutzpah.

29

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment in full.